# Exhibit "A"

**JAMES J. KREIG**
**KREIG BANKING EXPERT**
**15 RANDOLPH DRIVE**
**ROBBINSVILLE, NEW JERSEY 08691**
**(609) 203-3666**
**jimkreig@yahoo.com**

# EXPERT REPORT

### IN THE MATTER OF

***Barbara Johnson v. BB& T Corporation***, **United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2:17-cv-04490-JCJ**

# INTRODUCTION

I have been retained by counsel for the defendant Branch Banking and Trust Company, successor by merger to Susquehanna Bank, (hereinafter the "Bank")[1] to express my professional opinions as an expert in banking regarding whether or not the Bank acted with ordinary care and consistent with the reasonable commercial standards of the banking business and the terms of the Susquehanna Bank Customer Agreement and Deposit Account Agreement for the joint account of the plaintiff Barbara Johnson ("Barbara"), Richard A. Johnson Sr. ("Senior") and Richard A. Johnson Jr. ("Junior") ending in 3114 (the "3114 Account") by permitting Junior to:

a) be added as a joint owner on the 3114 Account with or without Barbara's consent.

b) change the address for the mailing of the monthly statements without Barbara's consent,

c) deposit a number of insurance proceeds checks bearing the allegedly forged endorsement of Barbara into the 3114 Account, and

d) withdraw the proceeds of the deposited insurance proceeds checks.[2]

I have also been asked to provide my expert opinion as to whether or not the Barbara failed to act consistently with her statutory duties and her contractual obligations to the Bank under the Susquehanna Bank Deposit Account Agreement by not monitoring her statements or promptly discovering and reporting to the Bank any allegedly unauthorized withdrawals from her joint account made by Junior.

---

[1]   Branch Banking and Trust Company is now known as Truist Bank.

[2]   These issues are taken from Paragraph 29 of the Second Amended Complaint.

# STATEMENT OF FACTS

I reserve the right to supplement the following facts and my opinions herein based on additional information that may later come to my attention.

This Expert Report adopts the facts as determined by Judge Tunnell in his Decision dated October 27, 2016 in the matter of The Estate of Richard A. Johnson Sr. Deceased, No. 1515-1782.[3] I incorporate these facts by reference into this Expert Report. Where I have deemed it appropriate, I have referenced certain of these facts as determined by Judge Tunnell in footnotes.

The factual findings of Judge Tunnell are supplemented by the following additional facts taken from the documents listed after the Statement of Facts.

## THE ACCOUNTS

### The 0301 Account

1.      Prior to January 2015, Richard A. Johnson Sr. ("Senior") opened an individual checking account (a "Senior Relationship Checking") at Susquehanna Bank, a predecessor of the defendant Branch Banking and Trust Company (the "Bank")[4]. This account was assigned an account number ending in 0301 (the "0301 Account"). The 0301 Account also listed Richard A. Johnson Jr. ("Junior") as the attorney-in-fact for Senior. Senior gave Junior a power of attorney over all of his accounts at the Bank.[5]

2.      The first monthly bank statement for the 0301 Account dated January 21, 2015[6] and the statements for the months thereafter listed the account holders as:

---

[3]   The complete reference to the Decision of Judge Tunnell is: Decision and Decree of the Honorable Mark L. Tunnell, Judge of the Court of Common Pleas, Chester County, Pennsylvania, Orphans Court Division, dated October 27, 2016 in the matter of The Estate of Richard A. Johnson Sr. Deceased, No. 1515-1782.

[4]   I will refer to both Susquehanna Bank and its successor BB&T, now Truist Bank, as the "Bank" in this Report.

[5]   See Power of Attorney Document, BB&T 000069.

[6]   See BB&T 000033.

Richard A. Johnson
Richard A. Johnson Jr. POA.

3.      The only deposits to the 0301 Account during the relevant time period were federal recurring benefit payments.

*4.      None of the insurance proceeds checks at issue in this lawsuit were deposited into the 0301 Account.*

## The 3114 Account

5.      On January 21, 2015, Barbara and her husband Senior physically went to Susquehanna Bank, a predecessor bank of BB&T, and opened a joint checking account. The account was assigned an account number ending in 3114 (hereinafter the "3114 Account").  Junior was also named as an additional joint owner of the account.[7]  Since Senior and Junior already had customer agreements at the Bank, only Barbara was required to sign a customer agreement on January 21, 2015.

6.      By opening the 3114 Account, Barbara entered into and agreed to the terms of the Susquehanna Bank Deposit Account Agreement dated September 2014 (the "Susquehanna Account Agreement").[8]

7.      The 3114 Account was owned jointly by Barbara, Senior, and her step-son Junior.[9]

---

[7]   See Deposition Transcript of Junior dated January 29, 2020 (hereinafter "Junior Transcript") at Page 18, Line 15.

[8]   See the Susquehanna Bank Deposit Account Agreement dated September 2014 attached to the "Customer Agreement" signed by Barbara dated January 21, 2015. This form of Customer Agreement permitted Barbara to open additional accounts at the Bank without the need to sign additional signature cards or account agreements.  I incorporate the terms of the "Customer Agreement" and the terms of the Susquehanna Account Agreement into this Statement of Facts by reference.

[9]   See Finding of Fact Number 13 on page 4 of the Decision of Judge Tunnell.  Also, Judge Tunnell noted in his Discussion of the facts that Barbara admitted that the 3114 Account was in the joint names of Barbara, Senior, and Junior.

Richard Jr. agrees that he was a joint owner of the 3114 Account.  See the "Discussion" section of the Decision at the bottom of page 5.

8.      Under the terms of the Susquehanna Account Agreement for the 3114 Account, any one of the three joint owners of the account (Barbara, Senior, and Junior), acting alone, could sign checks or otherwise withdraw funds.[10]

***THE INSURANCE PROCEEDS CHECKS***

9.      On January 21, 2015, a check dated January 5, 2015 in the amount of $10,000.00 drawn by the Lititz Mutual Insurance Company on its account at Susquehanna Bank payable to the order of "Richard Johnson and Barbara Johnson" was deposited into the 3114 Account.

10.      On February 14, 2015, a check dated February 4, 2015 in the amount of $1,400.00 drawn by the Lititz Mutual Insurance Company on its account at Susquehanna Bank payable to the order of "Richard Johnson and Barbara Johnson" was deposited into the 3114 Account.

11.      On or about March 13, 2015, a check dated February 17, 2015 in the amount of $882.24 drawn by the Foremost Insurance Company on its account at Citibank, N.A. payable to the order of "Barbara Johnson and Insurance Bureau, Inc." was deposited into the 3114 Account.

12.      On or about March 31, 2015, a check dated March 13, 2015 in the amount of $179,876.78 drawn by the Insurance Adjustment Bureau, Inc. on its account at PNC Bank payable to the order of "Barbara Johnson" was deposited into the 3114 Account.

13.      On May 13, 2015, a check dated March 4, 2015 in the amount of $153,553.39 drawn by the Lititz Mutual Insurance Company on its account at Susquehanna Bank payable to the order of "Richard Johnson & Barbara Johnson & First National Bank of Chester County & IAB Public Adj" was deposited into the 3114 Account.

14.      The insurance proceeds checks naming Barbara as a payee that were deposited into the 3114 Account during the relevant period total $345,712.41.[11]

---

[10]      See Susquehanna Bank Deposit Account Agreement, page 3 under the heading "WITHDRAWALS – Generally."

[11]      Barbara contends in Paragraph 10 of the Second Amended Complaint that Judge Tunnell found that a check for $900.00 drawn by the Foremost Insurance Company was deposited at BB&T.  I have not been provided with any evidence that this check was in fact deposited at the Bank.

Barbara also contends in Paragraph 11 of the Second Amended Complaint that Judge Tunnell found that a check for $90,149.66 was deposited at the Bank on May 12, 2015.  I have not been provided with any evidence that this check was in fact deposited at the Bank.

15.    All of the checks specifically identified by Barbara in the Second Amended Complaint that named Barbara as a payee total $436,762.07.

16.    Judge Tunnell found that checks payable to Barbara deposited at the Bank into the 3114 Account during the relevant period totaled $509,110.00.

17.    Barbara wanted all of the insurance proceeds checks deposited into the 3114 Account because that was the purpose for opening the account.[12]

18.    Barbara endorsed insurance proceeds checks ending in 8992 for $882.24, ending in 9973 for $1,000.00, ending in 4861 for $153,553.39 and ending in 7545 for $119,500.00.[13]


### BANK STATEMENTS FOR THE 3114 ACCOUNT

19.    Barbara listed her mailing address for monthly bank statements for the 3114 Account on her Customer Agreement at the time she opened the account on January 21, 2015 as 321 Pemberton Road, Kennett Square, Pennsylvania 19348.   Barbara was not living at 321 Pemberton Road, Kennett Square, Pennsylvania 19348 at the time she designated this address as the mailing address for the 3114 Account.[14]

20.    321 Pemberton Road, Kennett Square, Pennsylvania 19348 is vacant land containing a storage trailer used by Senior. The storage trailer could not be used as a residence.[15]   Barbara did not own this property.[16]

21.    The Bank sent the monthly bank statements for the 3114 Account to 321 Pemberton Road, Kennett Square, Pennsylvania 19348 for the monthly statements dated February 17, 2015, March 12, 2015, April 13, 2015 and May 13, 2015.

22.    The June 17, 2015 bank statement reflects the fact that the address of record for the 3114 Account was changed to 519 School House Road, Kennett Square, Pennsylvania 19348.

---

[12]   See Plaintiff Transcript at Page 78, Line 20.

[13]   See Plaintiff Transcript at Page 132, Line 15, Page 132, Line 20, Page 135, Line 5 and Page 138, Line 22.

[14]   See Plaintiff Transcript at Page 135, Line 24.

[15]   See Plaintiff Transcript at Page 136, Line 2 and Richard Jr. Transcript at Page 41, Line 12.

[16]    See Plaintiff Transcript at Page 9, Line 10.

23.     The total checks and other debits to the 3114 Account for the monthly bank statements dated May 13, 2015 through October 14, 2015 total $466,334.30.

24.     Checks and other debits to the 3114 Account totaled $87,314.35 for the statements dated February 17, 2015, March 12, 2015 and April 13, 2015 that were sent to the 321 Pemberton Road, Kennett Square, Pennsylvania 19348.  Barbara did not notify the Bank that any of the paid checks or other debit entries identified on these three months of statements were unauthorized. Barbara also did not notify the Bank that she believed Junior was an unauthorized accountholder for the 3114 Account.

25.     Barbara first notified the Bank that she claimed that Junior was not authorized to write checks or otherwise withdraw funds from the 3114 Account by letter dated April 6, 2017 sent by the law firm of Powell Patent Law Associates, LLC.  The letter was addressed to Wendy Petrondi, manager of the branch office of the Bank in Kennett Square Pennsylvania.[17]

26.     The only time Barbara physically went to a branch of the Bank was to open the 3114 Account on January 21, 2015.[18]

**END OF STATEMENT OF FACTS**

**REMAINDER OF PAGE LEFT BLANK**

---

[17]   See Plaintiff Transcript at Page 145, Lines 13 to 23.

[18]   See Plaintiff Transcript at Page 69, Line 23.

# DOCUMENTS REVIEWED

1.   Second Amended Complaint

2.   Answer of the Bank to the Complaint

3.   The Decision and Decree of the Honorable Mark L. Tunnell, Judge of the Court of Common Pleas, Chester County, Pennsylvania, Orphans Court Division, dated October 27, 2016 in the matter of The Estate of Richard A. Johnson Sr. Deceased, No. 1515-1782.

4.   Copies of bank statements for the joint account of Barbara, Senior, and Junior (the "3114 Account") for the months of January 2015 through October 2015.

5.   Copies of the checks at issue referenced in the Second Amended Complaint.

6.   Letter dated April 6, 2017 from the law firm of Powell Patent Law Associates, LLC addressed to Wendy Petrondi, manager of the branch office of the Bank in Kennett Square Pennsylvania.

7.   Transcript of the Deposition of Michael Paules dated January 24, 2020.

8.   Transcript of the Deposition of Barbara dated January 28, 2020.

9.   Transcript of the Deposition of Junior dated January 29, 2020.

10.  Transcript of the Deposition of Wendy Petrondi

11.  Transcript of the Deposition of Michelene Miller

12.  Transcript of the Deposition of Sohini Parikh

## FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B) INFORMATION

i.   a complete statement of all opinions the witness will express and the basis and reasons for them;

**Contained in this Expert Report**

ii.  the facts or data considered by the witness in forming them;

**Contained in or referenced to other documents in this Expert Report.**

iii.     any exhibits that will be used to summarize or support them;

**None at this time.**

iv.     the witness's qualifications, including a list of all publications authored in the previous 10 years;

**My knowledge of general banking practice with respect to the relationship of a bank to its customers is the result of over 47 years of experience with many banks.   To amplify the experience and qualifications listed on my resume attached to this Expert Report as Exhibit A, my work experience includes time served as Chairman of the Bank Operations Lawyers Council for a ten-year period starting in 1990.  The Council consisted of attorneys from various banks in the New York, New Jersey, Pennsylvania area.  Banks represented on this Council included The Chase Manhattan Bank, The Bank of New York, National Westminster Bank, Valley National Bank, Midlantic National Bank, First Union Bank, Sovereign Bank, PNC Bank, Summit (United Jersey) Bank and others. The topic of check processing was regularly discussed along with the actual mechanics of check processing and the appropriate bank policies and procedures which should be followed.**

**Additionally, I currently appear as an expert witness testifying both for and against banks in litigation involving checks and banking practices.  I also work as a consultant to banks and have reviewed numerous bank procedure manuals from both large and small banks.**

**No publications authored in the previous 10 years.**

v.     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;

**Listed on Exhibit B to this Expert Report.**

vi.     a statement of the compensation to be paid for the study and testimony in the case.

**My compensation is $400.00 per hour for all services including deposition and trial testimony plus reimbursement for all reasonable out-of-packet expenses for parking, mileage, tolls, coach air fare, hotel accommodations, meals while traveling and other expenses related to the engagement.**

**END OF SECTION**

# EXPERT REPORT

INTRODUCTION

In order to evaluate the actions of the Bank, it is necessary to first understand the legal and regulatory environment in which banks operate.  Banks base their procedures and other actions on compliance with the relevant law and the avoidance of unreasonable risk of loss to the bank.  In a case of this nature, one cannot understand or evaluate the actions of the Bank with respect to its actions in this matter without regard to the common law and statutory scheme for deposit accounts and checks under which a bank operates.  The Uniform Commercial Code, Pennsylvania Multiple Party Deposit Account Act, the general banking practices employed by banks in the Commonwealth of Pennsylvania and the customer agreement and deposit account agreement between the Barbara and the Bank form the basis for analysis of the claims of Barbara.

THE RELATIONSHIP BETWEEN A BANK AND ITS DEPOSITOR

The relationship between a bank and its depositor (customer) is contractual.  The contract arising from the opening of a checking account at a bank is that the bank will, whenever required, pay out the money in such sums and to such persons as the customer designates by his or her checks.

A check, by definition, is nothing more than a written order (or instruction) to a bank by its customer (the drawer) to pay a sum certain in money to a named payee on demand or after a given date.[19]  The signature of the customer on the check is the customer's authorization to the bank to pay the amount of the check from the customer's funds on

---

[19]   13 *Pa.C.S.A.* §3104(f).

deposit.  If the signature of the customer on the check is forged or unauthorized[20], then the check is not a valid order to the bank to pay out the customer's money to the payee. In the terminology of the UCC, a forged or unauthorized check is not "properly payable" from the customer's account.

OWNERSHIP OF THE 3114 ACCOUNT

Universally followed banking practice in the United States is to print the names of the owners of a deposit account on the periodic bank statements for the account.  Bank deposit systems are configured to capture the names, addresses and other personally identifiable information (taxpayer identification numbers, date of birth, etc.) at the time a deposit account is opened by the bank.  This information is then used to electronically complete signature cards before they are signed by the account owner(s), order checks and/or debit or ATM cards for the account owners, provide the source of bank statement information, prepare tax information reporting forms, and other back office and processing functions at the bank.  In that way, the owner information is only input once thereby saving time and reducing the possibility of "keyboard error."

In this case, all of the bank statements from the time the 3114 Account was opened on January 21, 2015 through the October 14, 2015 bank statement show the names on the monthly statements as:

> Richard A. Johnson
> Barbara A Johnson
> Richard A. Johnson Jr.

The fact that Junior is listed as an owner on the very first monthly bank statement

---

[20]  "'Unauthorized' signature means one made without actual, implied or apparent authority.  The term includes a forgery."  13 *Pa.C.S.A.* §1201(b)(41).

for the 3114 Account is significant.  Based on these three names being present on all of the bank statements for the relevant period, it is my opinion that the Barbara, Senior, and Junior were the three joint owners of the 3114 Account.

My opinion is supported by Finding of Fact Number 13 on page 4 of the Decision of Judge Tunnell where he found that the 3114 Account was owned by the Barbara, Senior, and Junior.  Also, Judge Tunnell noted in his Discussion of the facts that Barbara admitted that the 3114 Account was in the joint names of Barbara, Senior, and Junior.

## SENIOR COULD ADD JUNIOR AS AN ACCOUNT OWNER WITHOUT THE CONSENT OF BARBARA

General banking practice in Pennsylvania and other states historically was for banks to offer two different forms of joint accounts.  One form is known as an "or" account. The other is known as an "and" account.

In an "or" account form of ownership, either joint owner, acting alone, can withdraw funds and otherwise conduct all business on the account.

In an "and" account both (or all if more than two) joint owners must act jointly with respect to all transactions and dealings relative to the account.  An "and" account requires all of the joint owners to sign checks or instruments for the withdrawal of funds.  All owners must jointly request wire transfers or stop payments on checks. And all must agree to any action with respect to the account.  In addition, the owners of an "and" account cannot have an ATM or debit card as the bank has no way to know if all of the owners are present at the ATM or at the merchant at the time the card is used.  Similarly, the owners of an "and" account cannot use the bank's internet banking service as the bank cannot know if all of the owners are sitting at the keyboard or using the cell phone at the same time.

Due to the practical difficulties of operating a joint account that is structured as an "and" accounts, most banks in the United States over the past 20 years or so have ceased offering a joint account that is structured as an "and" account.

The Susquehanna Bank Deposit Account Agreement reflects the fact that the Bank at the time the 3114 Account was opened only offered a form of joint account that was an "or" account.[21]  Accordingly, under the terms of the Susquehanna Bank Deposit Account Agreement, either Barbara, Senior, or Junior, acting alone, could sign checks, withdraw funds and otherwise conduct all business with the Bank.  This "or" contractual arrangement also meant that EITHER Barbara OR Senior OR Junior, acting alone, could appoint an attorney-in-fact to act for them with respect to the account or authorize the Bank to add another owner to the account.

In this case, it is my expert opinion consistent with general banking practice, that Senior could add Junior as an additional owner to the joint account without the knowledge or the consent of the Barbara.

SENIOR OR JUNIOR COULD CHANGE THE MAILING ADDRESS ON THE 3114
ACCOUNT WITHOUT THE CONSENT OF BARBARA

---

[21]  The Pennsylvania statutory form of joint deposit account only creates an "or" account.  The statute does not authorize "and" accounts.  *See* 20 *Pa.C.S.A.* 6301:

The following words and phrases when used in this chapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section:

*        *        *

**"Joint account"** means an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship.

*        *        *

As stated above, the 3114 Account was a joint "or" account.  Pursuant to the terms of the Susquehanna Bank Deposit Account Agreement, any joint owner, acting alone, could give the Bank instructions for the management of this account.  Accordingly, any one of the joint owners of the 3114 Account could give the Bank instructions to change the mailing address for the statements for the 3114 Account.  Therefore, the consent of the Barbara to change the mailing address on the 3114 Account was not necessary when the requests to change the address came from another joint owner of the 3114 Account.

Moreover, at the time the 3114 Account was opened, Barbara gave the Bank a mailing address for the account that was vacant land on which Senior had a storage trailer.  Barbara herself testified that she never lived at the address she gave as the mailing address for the account and never received or monitored mail at that address.

In this case, the April 17, 2015 statement and the May 13, 2015 statement for the 3114 account was returned as undeliverable by the Postal Service.  Thereafter, the address of record was changed. Yet Barbara never notified the Bank that she was not receiving the monthly bank statements for the account and never inquired as to the account activity in the account.[22]

## OWNERSHIP OF FUNDS IN A JOINT ACCOUNT IS INDEPENDENT OF THE RIGHT TO WITHDRAW FUNDS

Under the Pennsylvania Multiple Party Deposit Account Act,[23] ownership of the funds on deposit in a joint account is independent of the right of any joint owner to

---

[22]   It is unclear whether Barbara ever received the January through April 2015 statements for the account.

[23]   20 *Pa.C.S.A.* 6301 et seq.

withdraw the funds. Each owner of a joint account owns his or her own contribution to the balance of funds on deposit.[24]  So, for example, if A and B have a joint account with a balance of $10,000 and A deposited $8,000 and B deposited $2,000, then A owns 80% of the balance in the account.

Regardless of the ownership of the funds on deposit, Pennsylvania law (and the terms of the Susquehanna Bank Deposit Account Agreement) gives each joint owner, acting alone, the power to withdraw all of the funds in the account.  However, if one owner withdraws the funds deposited by another joint owner, then the owner withdrawing the funds is obligated to repay the owner of the funds the amount taken.  In the case of an account jointly owned by A and B, either A or B can withdraw all of the funds from the account. However, under Pennsylvania law, if B withdraws more than the amount B deposited, then B is obligated to repay A for the portion of the funds owned by A and withdrawn by B. The bank involved has no obligation under Pennsylvania law to track or keep a record of which joint owner deposited what portion of the balance on deposit.

Assuming that all of the funds from the insurance proceeds checks naming Barbara as a payee were withdrawn by Junior, then Junior would have an obligation to pay the Barbara her funds.  The Bank has no liability to Barbara as Junior was authorized as an account owner as determined by Judge Tunnell and the records of the Bank to withdraw the funds.  Given that Junior could not account for the use of some of the funds, Judge Tunnell in the Orphan's Court matter found Junior liable to Barbara for the sum of $200,000.00.  This determination of liability is consistent with the fact that as between

---

[24]  20 *Pa.C.S.A.* 6303(a).

joint owners of an account, the ownership of the funds is between the joint owners and not the responsibility of the bank.

BARBARA WARRANTED TO THE BANK THAT HER ENDORSEMENTS ON THE INSURANCE PROCEEDS CHECKS WERE GENUINE AT THE TIME OF DEPOSIT

Contrary to the assertions in the Second Amended Complaint, banks do not attempt to verify the genuineness of the endorsements on a deposited check at the time a check is deposited.  This is because (1) the customer depositing the check warrants to the bank as a matter of law that all of the endorsements and signatures on the check are genuine, and (2) in many cases it is impractical or impossible to do so as one or more of the payees is not a customer of the depositary bank and hence the bank does not have an specimen of the payee's signature on file.

The Uniform Commercial Code, in Sections 4-207 and 4-208,[25] creates a system of transfer and presentment warranties.  These warranties are made as a matter of law in connection with the transfer and presentment for payment of a check.  The concept behind these warranties is to make the negotiation of a check speedy and efficient by eliminating the need for each bank handling the collection of the check to independently verify or confirm the information covered by the warranties.

One of the transfer warranties given by a customer to the depositary bank at the time that the customer deposits the check is the warranty that "all signatures on the item are authentic and authorized."[26]  Accordingly, at the time that all of the insurance proceeds checks were deposited at the Bank, the customer of the Bank depositing the

---

[25]   See 13 *Pa.C.S.A.* §§4207 and 4208.

[26]   See 13 *Pa.C.S.A.* §4207(a)(2).

checks warranted to the Bank that the endorsements of the Barbara on the checks were "authentic and authorized."  As the "customer" in this case was Barbara, Senior, and Junior, (collectively) they warranted to the Bank that the endorsement of Barbara on these deposited insurance proceeds checks was authentic.

In cases where a payee of a check is not a customer of the depositary bank, it would be impossible for the depositary bank to verify the genuineness of the endorsement of that payee.  For example, a co-payee on the insurance proceeds checks was a public adjuster named "Insurance Adjustment Bureau, Inc."  As the Insurance Adjustment Bureau, Inc. was not a customer of the Bank, the teller at the Bank would have no way to determine if the endorsement of the Insurance Adjustment Bureau, Inc. on a check was genuine.  Instead, the Bank relied on the transfer warranty given by Barbara that the signature of Insurance Adjustment Bureau, Inc. on the backs of these checks was "authentic and authorized."

This protocol is entirely consistent with what Barbara agreed to in the Susquehanna Bank Deposit Account Agreement. That agreement specified that the Bank relies "solely on the information encoded in the magnetic ink along the bottom" of the check and does not examine checks to determine if they are "properly completed, signed and indorsed."[27]

In this case, Barbara, Senior, and Junior (collectively as the "customer" of the Bank) warranted to the Bank that all of the endorsements of Barbara on the deposited insurance proceeds checks were genuine.  Barbara cannot now claim that the Bank was

---

[27] Susquehanna Bank Deposit Account Agreement, page 8 under the heading "CHECK PROCESSING"

negligent for failing to verify the genuineness of her endorsements that she herself warranted to the Bank were genuine.

## BANKS DO NOT VERIFY THE GENUINENESS OF ENDORSEMENTS ON DEPOSITED CHECKS

Generally banking practice is for the teller (or other bank employee accepting a check for deposit) to compare the name of the payee(s) on the check to the name(s) on the account into which the check is being deposited. The reason for this practice is that the bank into which a check is deposited (known as the "depositary bank") has an obligation to verify that the funds represented by the check reached the named payee. Banks generally do this by verifying that the check is deposited into an account in the name of the payee on the check.

Depositary banks do not attempt to decipher what often is a scribble on the back of a check to attempt to determine if that scribble is the genuine endorsement of the payee. Rather, the depositary bank compares the name of the payee to the name on the account into which the check is being deposited. If the names are substantially similar, then the depositary bank accepts the check for deposit. For example, if a check is payable to the order of John Smith and Mary Smith and the name on the account is "John Smith," the bank will accept the check for deposit. Similarly, if the payee is John Smith and the account is in the names of John Smith and Mary Smith, the depositary bank will accept the check for deposit.

Once the teller verifies that the name of the payee of the check is substantially similar to the name on the account into which the check is being deposited, the teller will turn over the check to verify that there is a signature (endorsement) on the back of the

check.  However, the teller does not attempt to verify the genuineness of the endorsement – only that an endorsement is present.[28]

I also note that Section 4-205 of the UCC[29] permits a depositary bank to accept an <u>unendorsed check</u> for deposit as long as the check is being deposited into an account in the name of the payee of the check. The Susquehanna Bank Deposit Account Agreement "Indorsements" section similarly permits the Bank to accept unendorsed checks.[30]

### WHETHER OR NOT THE ENDORSEMENT OF PLAINTIFF ON SOME OF THE DEPOSITED INSURANCE PROCEEDS CHECKS IS FORGED IS IRRELEVANT AS BARBARA RECEIVED THE PROCEEDS OF THE CHECKS

In this case, all of the insurance proceeds checks at issue were deposited into the 3114 Account.  Even if someone forged the endorsements of Barbara on all of these checks, Barbara suffered no loss from the deposit of these checks as all of the checks were deposited into her account.  In fact, Barbara testified at her deposition that she wanted all of the insurance proceeds checks deposited into the 3114 Account as that was the purpose of opening the account.

### BARBARA FAILED TO TIMELY NOTIFY THE BANK OF ANY ALLEGEDLY UNAUTHORIZED WITHDRAWALS FROM THE 3114 ACCOUNT

Barbara contends that the Bank breached the terms of the Susquehanna Bank

---

[28]  It would be extraordinarily rare for a thief to steal a check from the payee, forge the payee's endorsement, and then go into the payee's bank and deposit the check into the payee's account. The thief would subject himself or herself to criminal liability for no gain.  Moreover, the payee would have no loss as the funds represented by the check were credited to the payee's account.

[29]  13 *Pa.C.S.A.* 4205.

[30] Susquehanna Bank Deposit Account Agreement, page 8 under the heading "CHECK PROCESSING"

Deposit Account Agreement by allowing Junior to withdraw the proceeds of the insurance proceeds checks from the 3114 Account.[31]

This contention is without merit as the terms of the Susquehanna Bank Deposit Account Agreement permitted any joint owner, acting alone, to withdraw funds from the account.

However, even if one assumes that the withdrawals from the 3114 Account were unauthorized, Barbara failed to give timely notice of the withdrawals to the Bank and is therefore barred from asserting this claim.

***The Statements were Made Available to Barbara***

The Susquehanna Bank Deposit Account Agreement that Barbara agreed to at the time she opened the 3114 Account required her to exercise reasonable promptness to examine her bank statements to discover and report to the Bank any unauthorized signatures or forgeries on any check drawn on her account.  The Deposit Account Agreement further provided that the Bank would have no liability to Barbara if she failed to discover and report any unauthorized or forged signature on any check within 60-days of when the bank statement is "first sent or made available to [her]."

There is no factual dispute that Barbara failed to discover and report to the Bank the allegedly unauthorized signatures of Junior on the checks at issue within the 60-day period.  However, Barbara seeks to avoid this contractual and statutory limitation by arguing that Junior wrongfully changed the address of record for the 3114 Account so that the bank statements were being mailed to him and not to Barbara.

---

[31]   See Plaintiff Transcript at Page 87, Line 17 and Page 117, Line 2.

This argument fails on several levels.  Aside from the fact that Barbara directed the mailing of the monthly bank statements to a vacant lot and testified that she never questioned the non-receipt of the bank statements, the Susquehanna Bank Deposit Account Agreement makes the sending of bank statements by mail only one of several ways to "make the statement available."

Banks make statements available in several ways.  The first is the mailing of the statement.  The second is printing out a copy of the bank statement at any branch and handing the statement to the customer.  The deposit systems used by banks include the capability of enabling a branch employee to print a copy of a customer's bank statement in the branch upon request of the customer.

When Barbara failed to receive her monthly bank statements, she should have contacted her branch and inquired as to the reason why the statement was not received. Had she done so, she could have provided a better mailing address for the account.  In the interim, she should have gone to her branch and asked an employee to print out a copy of the bank statement that she did not receive.

Banks also make copies of bank statements available through the online banking or the internet banking service of the bank.  Virtually all banks offer some form of online or internet banking to their retail customers.  Normally, this service is without cost to the customer and includes a complimentary bill pay service.  Again, Barbara could have availed herself of the internet banking service of the bank and monitored and reviewed the transactions in her account as frequently as daily.  In this case, Barbara admits that she did not do so.

Based on the foregoing, it is my expert opinion, to a reasonable degree of professional certainty, that the Bank made the statements for the 3114 Account available to Barbara consistent with general banking practices during the time period at issue.

***Barbara Failed to Give Timely Notice of the Allegedly Unauthorized Withdrawals within the 60-Day Period Required by the Susquehanna Bank Deposit Account Agreement***

The Susquehanna Bank Deposit Account Agreement states in relevant part:

> **STATEMENTS - Your duty to report unauthorized signatures, alterations and forgeries -** You must examine your statement of account with reasonable promptness. If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts.  As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirety yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss).  The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer. You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you. You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you arid us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

> **Your duty to report other errors -** In addition to your duty to review your statements for unauthorized signatures. alterations and forgeries. you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. You agree that the time you have to examine your statement and report to us will depend on the circumstances. However, such time period shall not exceed 60 days. Failure to examine your statement and report any such errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any such errors on items identified in that Statement and as between you and us the loss will be entirely yours.

In this case, all of the funds at issue were withdrawn from the 3114 Account during the period January 21, 2015 through October 14, 2015.

The first notice to the Bank by Barbara that she objected to the withdrawal of funds from the 3114 Account was by letter dated April 6, 2017 from the law firm of Powell Patent Law Associates, LLC addressed to Wendy Petrondi, manager of the branch office of the Bank in Kennett Square Pennsylvania.  Barbara is not aware of any prior notice to the Bank.[32]

Based on the fact that Barbara failed to give the Bank notice of any allegedly unauthorized withdrawals from the 3114 Account within the 60-day required notice period or even the one year period in 13 Pa.C.S. § 4406(f), it is my opinion that her claim is barred pursuant to the terms of the Susquehanna Bank Deposit Account Agreement.

## CONCLUSION

Based on the foregoing, it is my opinion, to a reasonable degree of professional certainty, that:

A.  Junior was an owner of the 3114 Account and the consent of Barbara to name him as an owner was not necessary.

B.  Any one of the three joint owners of the 3114 Account could change the mailing address for statements for the account without the consent of the other owners.

C.  The Bank acted with ordinary care and consistently with the reasonable commercial standards of the banking business by accepting for deposit the insurance proceeds checks naming Barbara as a co-payee;

---

[32]   See Barbara Transcript, Page 145, Lines 13 to 23.

D.  Barbara suffered no loss or injury from the deposit of the insurance proceeds checks as the funds were credited to her account at the Bank;

E.  Junior, acting alone, could withdraw all of the funds from the 3114 Account without the consent of the Barbara,

F.  The monthly bank statements for the 3114 Account were made available to Barbara by the Bank; and

G.  Barbara failed to discover and report to the Bank within the required (1) 60-day period of the Susquehanna Bank Deposit Account Agreement or (2) the one year period in 13 Pa.C.S. § 4406(f) any alleged unauthorized transaction in the 3114 Account.

    If requested to do so, I will so testify to the foregoing at a deposition or a trial.

                     James J. Kreig

Dated:  March 29, 2020

# EXHIBIT A

### RESUME OF JAMES J. KREIG

## JAMES J. KREIG
## 6466 RUBIA CIRCLE
## APOLLO BEACH, FLORIDA 33572
## (609) 203-3666 (Cell)
## jimkreig@gmail.com

### <u>WORK HISTORY</u>

**August 2016 to December 2019 – KEARNY BANK**, Fairfield, New Jersey 07004

**Senior Vice President & General Counsel –** Provided legal advice and guidance to the management and staff of a $6.6 billion community bank with 54 offices in New Jersey and New York.  Advised on bank regulatory compliance matters, reviewed and negotiated contracts, created loan and deposit-related forms, resolved customer-related issues and assisted management in preparing policies, procedures and operational guidance.

**November 2011 to November 2015 – ALLY BANK**, Fort Washington, Pennsylvania 19034

**Deposit and eCommerce Counsel –** Provide legal and bank regulatory compliance support for the Internet deposit-taking activities of a $106 billion bank.  Provide advice to management for the account opening, check deposit and deposit processing, ACH, debit card, bill payment, ATM, vendor management and other deposit-related activities. Provide related advice on applicable federal consumer protection laws and regulations including Federal Reserve Regulations DD (Truth in Savings), CC (Expedited Funds Availability), E (Electronic Funds Transfers) and D (Reserve Requirements).

**April 2010 to June 2011 - TD BANK, N.A.**, Cherry Hill, New Jersey   08034

**Vice President and Senior Counsel –** Provide legal advice and guidance to the Retail Operations Division and its 1,300 branch offices and back offices with respect to deposit products and branch operations.  Also provide legal support to the Cash Management, Government Banking, Levy and the Corporate Security and Investigations Departments.

**January 2006 to February 2010 – SPIRIT OF AMERICA NATIONAL BANK**, Bensalem, Pennsylvania 19020

**Bank Counsel and Director of Compliance –** Provided legal and regulatory compliance advice to the Board of Directors and management of a bank specializing in issuing credit cards to the retail and catalog industries.  Advised the business units on legal issues, oversaw the activities of outside counsel, ensured compliance with consumer protection laws relative to credit cards, and served as the liaison with the bank regulatory authorities. Also served as the Secretary to the Board of Directors.

**November 2004 to December 2005** – **JAMES J. KREIG, ATTORNEY AT LAW,** Robbinsville, New Jersey 08691

**Solo Legal Practice –** Created a legal practice specializing in providing "bank general counsel" services for small financial institutions in New Jersey.

**May 2001 to November 2004 - METLIFE BANK, N.A**., Bridgewater, New Jersey 08807

**General Counsel and Corporate Secretary –** Hired by Metropolitan Life Insurance Company to create the legal and compliance structure for its direct bank affiliate – MetLife Bank, N.A.  Formulated and implemented an internet-based legal strategy to market MetLife Bank's products and services to the 44 million customers of the MetLife enterprise.  Primary duties included:

- Advised the MetLife organization on legal issues concerning the relationships of MetLife Bank with its insurance and broker-dealer affiliates under the anti-tying provisions of Section 106 of the federal Bank Holding Company Act and Federal Reserve Regulation W (Sections 23A and 23B)(Transactions between Banks and their Affiliates) in connection with inter-affiliate organizational structure, service contracts, product offerings, borrowings and loans.

- Planned and implemented a compliance program for all state and federal banking legislation and regulation including Bank Secrecy Act/Anti-Money Laundering, USA PATRIOT Act, OFAC requirements, Community Reinvestment Act, Fair Credit Reporting Act, Check Clearing for the 21st Century Act, Fair and Accurate Credit Transactions Act and Federal Reserve Regulations CC (Expedited Funds Availability), DD (Truth in Savings) and E (Electronic Fund Transfers).

- Provided corporate governance and organizational advice to the MetLife organization in connection with transactions with affiliates.  Maintained all corporate records including the articles of association and by-laws.  Prepared all Board meeting packages and keep the minutes of all board and board committee meetings.

**February 1977 to May 2001 - SUMMIT BANCORP,** Princeton, New Jersey 08543

**Senior Vice President and Group Counsel** (1990 to 2001)   Manager of the Litigation and Retail Banking Groups of the Legal Department of a $39 billion bank holding company.  Supervised a staff of 7 attorneys, 5 paralegals and other support personnel providing legal advice and guidance to management to obtain the maximum competitive advantages within the law.  Principal areas of supervisory responsibility included:

- Supervising compliance with all deposit-related regulations including Bank Secrecy Act, OFAC regulations, Federal Reserve Regulations DD (Truth in Savings), Regulation CC (Expedited Funds Availability and the Collection of Checks) and Articles 3, 4, 4A and 5 of the Uniform Commercial Code.

- Oversight of the legal and operations aspects of the retail lending activities (consumer loan, residential mortgage, credit card and small business lending) in New Jersey, Pennsylvania and Connecticut, including the compliance and the preparation of standard loan documents and forms.

- Managing the defense of litigation against the organization including class action, corporate trust, securities, check processing and letter of credit cases.  Worked with the New Jersey Bankers Association to pass legislation to assist in the resolution and prevention of litigation against banks.

- Human Resources matters, including the development of policies and procedures and the management of employment-related claims and litigation.

**Vice President & Assistant Counsel III** (1980 to 1990).  Supervised a staff of two attorneys providing the legal support to the bank operations officers. Principal duties included the preparation of deposit account agreements and branch operating procedures; the defense of litigation involving checks, check processing and other claims arising under Articles 3 and 4 of the Uniform Commercial Code, and the preparation of contracts for controlled disbursement, zero balance, lock box, wire transfer, ACH and other corporate cash management services.

**Regional Audit Manager and General Auditor Positions** (1977 to 1980).  Formulated and executed a general audit plan that was sufficiently detailed to provide the Board of Directors with reviews and appraisals of subsidiary bank operating procedures and internal accounting controls.  Met quarterly with the audit committee of the board of directors of each bank to discuss significant audit findings.

**1974 to 1977 - FIRST FIDELITY BANCORPORATION,** Newark, New Jersey 07102

**Senior Auditor -** Responsible for supervising a staff of 8 to 12 auditors conducting financial and operational audits of subsidiary bank branches and departments.

**1973 to 1974 - STATE OF NEW JERSEY, DEPARTMENT OF BANKING,** Trenton,

New Jersey, 08625

**Savings and Loan Examiner -** Conducted field examinations of the books, accounts and records of state-chartered savings and loan associations.

## EDUCATION

J. D., 1979, Seton Hall University School of Law.  Member of the New Jersey Bar.

M.B.A., 1973, Rutgers Graduate School of Business Administration

B.A., 1972, Rutgers University.

## PUBLICATIONS

Author, "The Missing Signature as an Unauthorized Signature of the Customer – The Debate Continues," 104 *Banking Law Journal* 542 (1986)

Co-author, "Dishonored Payable Through Drafts – Deadline for Return," 103 *Banking Law Journal* 357 (1986)

## OTHER

**Director of a State-Chartered Community Bank (2016) –** Served as the sole independent member of the Board of Directors of a $1.1 billion community bank located in New Jersey.  Chairman of the Compliance Committee and member of the Audit and ALCO Committees of the Board.

**Director of a National Bank (2003 to 2004) –** Served as a member of the board of directors and member of the board-level Compliance Committee for a $500 million asset national bank located in New Jersey.  Assisted the management team in extricating the bank from a Formal Agreement with the Office of the Comptroller of the Currency.

**Bankers Compliance Advisors –** Started and operated a successful bank compliance consulting service specializing in assisting banks in addressing and overcoming cited regulatory shortcomings in the areas of compliance with the federal Bank Secrecy Act and consumer protection laws and regulations.

**Professor/Trainer** – Conducted training seminars for the New Jersey Bankers Association and the New Jersey League of Community Bankers on various legal and compliance topics.  Guest lecturer at Seton Hall University, School of Law, on Articles 3 and 4 of the Uniform Commercial Code.

**END OF EXHIBIT A**

# EXHIBIT B

**James J. Kreig**
**Expert Testimonial History – Trial and Depositions**

**2020**

None.

**2019**

*Oscar Tito Cardoso Fernandes and OTCF Real Estate Investments, LLC v. Wells Fargo Bank, N.A.,* American Arbitration Association Case Number 01-17-0007-6794, Miami, Florida (Testimony at Arbitration Hearing on November 7, 2019)

*Severin Mobile Towing, Inc. d/b/a USA Towing & Recovery v. J.P. Morgan Chase Bank, N.A.*, Superior Court of the State of California, County of San Diego, Central Division, Case No. 37-2017-00031451-CU-MC-CTL (Deposition on September 19, 2019)

*Samuel S. Liera v. U.S. Bank, N.A. and Equifax Information Services, LLC,* United States District Court, Central District of California, Case No: 8:17-cv-00603 CJC (KESx) (Deposition on March 28, 2019)

*United States of America v. Germaine King et al.*, United States District Court, District of New Jersey, Case No. 2:18-mj-07038 – CLW (Trial Testimony on June 6 and 7, 2019)

**2018**

*Riseley & Moriello, PLLC et al. v. M& T Bank et al.,* Supreme Court of the State of New York, County of Ulster, Index No. 10-1457 (Trial Testimony on January 31, 2018 and February 2, 2018)

*Pancake Republix, LLC v. ConnectOne Bank and Chanel Rojas,* Superior Court of New Jersey, Law Division, Bergen County, Docket No.  BER L 5663-16 (Deposition on April 6, 2018)

**2017**

*Philip L. Marchiondo & Associates, Inc. and Philip L. Marchiondo v. Citibank, N.A. and John Does 1-10,* Superior Court of the State of California for the County of Los Angeles, Case No. BC521052 (Deposition on August 21, 2017)

*Steve E. King v. SunTrust Mortgage, Inc. v. F & C Bank*, In the 17th Judicial Circuit Court of Johnson County, Missouri, Case No. 16JO-CC00165 (Deposition on June 16, 2017)

*Mai Thi Thu Tran v. Citibank, N.A.,* United States District Court for the District of Columbia, Case Number 1:15-cv-01309-JDB (Deposition on March 16, 2017)

**2016**

*Interaudi Bank v Harco Industries, Inc USA.,* Superior Court of New Jersey, Law Division, Bergen County, Docket No. BER L 6988-15 (Deposition on May 10, 2016)

*Tri-co Federal Credit Union v. Zydel Provisions, Inc.; Adam Zydel, Chris Cane and Christine Cane,* Superior Court of New Jersey, Law Division, Morris County, Docket No. MRS L 003373-13.  (Arbitration on May 24, 2016)

**END OF EXHIBIT B**